## ROSE MORRISON *vs*. RHODE ISLAND COMPANY.

### JULY 2, 1918.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, and Baker, JJ.

*(1)   Negligence.   Last Clear Chance.   Question for Jury.*

Where there was testimony from which, if believed, the jury could properly find that plaintiff was visible at such a distance from where she was hit by an electric car as to permit the motorman to see that she was in a place of danger and apparently unaware of it and that he was negligent in not stopping the car in order to avoid hitting her, in accordance with the doctrine of the last clear chance, it was not error to submit the case to the jury.

*(2)  Negligence.*

In a personal injury action request to charge that "If as soon as the motorman saw plaintiff in a position of danger, he used every appliance at his command to stop the car, he was not guilty of negligence in failing to stop the car before he struck plaintiff," was properly refused on the ground that it omitted the point that he should have seen plaintiff if he could have seen her.

*(3)   Negligence.   Street Car Tracks.   Contributory Negligence.*

In a personal injury action it appeared that in the street where the accident happened there were two car tracks and that ordinarily southbound cars used the west track, but at that time owing to construction work, the west track was alone used for cars going in both directions.   Plaintiff alighted from an automobile, beside the west track.   She testified that having seen no car approaching from the south as she alighted she took a position permitting her to see a car coming from the north and that according to her observation where there were two tracks in a street, cars always proceeded on the track which in relation to the direction in which they'were going, was on the right and that she never knew them to go otherwise;   that she was not aware of the existing conditions and that she did not hear or see the car which struck her coming from the south.

*Held,* that on these facts the case was properly submitted to the jury on the question of fact whether plaintiff was in the exercise of the care required of her in the circumstances in failing to see or hear the approaching car in season to move from the place where she stood.

*(4)   Negligence.   Last Clear Chance.*

Where the court charged that if it were assumed that plaintiff was negligent up to the time she was struck, but the motorman had the opportunity to avoid striking her by using the appliances under his control,   and failed to do so, defendant would be liable and no exception was taken, under such statement of law even if the jury found that plaintiff was negligent it would not be decisive in the event they also found the motorman negligent under the doctrine of the "last clear chance."

*(5)   Negligence.   Damages.*

In personal injury action verdict for $16,000 disapproved on the evidence.

TRESPASS ON THE CASE for negligence.   Heard on exceptions of defendant and overruled except as to damages.

BAKER, J.   This is an action of trespass on the case to recover damages for injuries alleged to have been caused by the negligence of the defendant's agents and servants.

The case was tried in October, 1916, before a justice of the Superior Court sitting with a jury and a verdict was rendered in favor of the plaintiff in the sum of $16,000.   The defendant excepted to the refusal of the court to direct a verdict in its favor, to the denial of a motion for a new trial, to a certain portion of the charge to the jury and to the refusal of the court to charge the jury in accordance with four separate requests made by it, and the case is now before this court on these exceptions.   The bill contains four other exceptions but they are waived.

The testimony shows that the plaintiff was struck by an electric car of the defendant corporation at about twenty minutes after nine o'clock in the evening of June 20, 1915, on Elmwood avenue, in the city of Providence, at a point a short distance south of its junction with Roger Williams avenue.

The plaintiff and a friend, named Thomas Rondina, on the evening in question had taken a jitney near the city hall, in Providence, for the purpose of having a ride to East Greenwich.   In the car beside the driver were two other passengers, a man and his son, a boy nine years old.   As the car proceeded southward there was a puncture of the tire on its right rear wheel and the driver drew up alongside the westerly curb on Elmwood avenue in order to make the necessary repairs.   In Elmwood avenue at this point are two car tracks, one on each side near the sidewalk, leaving the middle or central portion of the avenue for use by other vehicles.   Ordinarily southbound cars use the westerly track and the northbound cars the easterly track.   In June, 1915, owing to the fact that a bridge over a steam railroad track farther to the south was in process of repair the westerly

track was alone used by cars going in both directions between Roger Williams Park on the south and the car barn on the north, a distance of about half a mile. The situation at the place of the accident more fully described was this: The car track was practically straight for several hundred feet and was located near the west sidewalk. Next east of the track was a strip of earth several hundred feet in length, bounded on its easterly side by the westerly street curb, which strip measuring from the said curb to the easterly rail of the track was practically six feet in width for its entire length. On it near the curb were trolley and electric light poles and a row of trees about fifty feet apart—two of them of considerable size being upwards of twenty inches in diameter—the others small, ranging from four to five inches in diameter. The strip for the most part was covered with grass. The distance between the easterly rail of the track and the westerly side of the poles and trees was for the most part more than four feet but as to one pole was given as three feet and three inches and the southernmost large tree as three feet and five inches. The overhang of the running board of the car in question when down—as it was shown to be at the time of the accident—was twenty-four inches.

After the jitney drew up to the curb the driver and all the passengers got out—the plaintiff and boy after the others and doing so in order to permit the driver to obtain from under the rear seat certain tools and a fresh tube. Mr. Rondina assisted the driver, while the other three stood upon the strip looking on the plaintiff standing between the father and son and a little to the rear of them. All the occupants of the jitney say that it was drawn up at or close to a bare spot on the strip, which was shown to be about 70 to 75 feet south of the southernmost large tree and about 100 feet north of an electric light pole and nearly opposite but a little south of a hedge which was a few feet south of a house located on the west side of Elmwood avenue. The plaintiff says she stood about two or two and a half feet away from the car track; that she was facing towards the Park as she

alighted and there was then no car in sight; that she had not been on Elmwood avenue for seven or eight months and did not know that the westerly track was then being used by the northbound cars or that when there were two tracks on a street cars ever ran on the left side of the street; that while watching the fixing of the tire she stood facing the roadway but in such way that she could see a car coming from the city, as she thought that such a car might strike her where she stood, but did not again look toward the Park. Two or three minutes after alighting and while so standing and without having moved she was struck by the car, a northbound electric, which she had not before seen or heard, and which was the first car passing after their arrival at the place of the accident.   All of the occupants of the jitney say that they neither saw nor heard the electric car until it was upon them, except the driver, who testifies that as he was bending over to pick up a tool from the ground at the rear of his car he saw the electric car headlight when the car was 20 or 25 feet away and shouted a warning, but it was too late.   The speed of the car so far as it was specifically stated by plaintiff's witnesses, some of whom were passengers on the car, ranged from 15 to 25 miles an hour.   The jitney was a Ford car and after it stopped displayed no large head-light, but did show at the front of the car a red light on the right and a white light on the left.   At the time many automobiles were said to be passing in the roadway blowing their horns.   The plaintiff wore a dark suit and a large black hat.

The defendant offered testimony by the crew of the car and by one or more of its passengers that the jitney was drawn up to the curb near but north of the southernmost of the two large trees, or approximately 75 feet to the north of the location of the bare spot as testified to by several of the plaintiff's witnesses.   The electric car was a large open one—more than 40 feet long—the track there was on an incline and the motorman said the car was running from 10 to 15 miles an hour with power shut off, and that he was

ringing his bell and looking ahead, and that just before the plaintiff was struck he blew his whistle and threw on the power in reverse. Several passengers testify to his ringing of the bell and the blowing of the whistle. The car had a headlight of the size ordinarily used in the city. The motorman and other witnesses say that it was quite dark along there. He says that just before he "got in front of the house where the hedge was, perhaps 15 or 20 feet," he "saw an automobile on the right hand side of the road" . . . "and there were some people down in there by the tree." "There was a girl come out dressed in black. She had a black hat on." If the first big tree was referred to then he saw them at a distance of about 90 feet. He says elsewhere that he was 15 or 20 feet away from *them* when he first saw them. He also says that when he first saw plaintiff "she was about three feet or thereabout from the track;" that "she stepped out around there" which brought her within the overhang of the car. In another place he says she stepped out from behind the tree; that before she stepped out the tree was between her and him. Another witness, a passenger sitting near the front of the car testifies to seeing something step from behind a tree, and they were "right on top of the tree when the object came from behind it"—four or five feet away. This witness gives the speed of the car as six or seven miles an hour.

On the front seat of the car, immediately behind the motorman, sat three young ladies who testified in the case, two called by the plaintiff, the third by the defendant. The one sitting at the right end of the seat testified that when the car was at the top of the hill she saw a woman ahead, standing by a machine on which was a red light; the woman wore a dark suit and a big black hat. In answer to a question as to whether the woman moved after she saw her she replied, "not that I know of." After saying that the distance from the top of the hill to the woman was "considerable," that she couldn't estimate it in feet, on being pressed judged it to be "about a hundred if not more feet away." It devel-

oped in cross-examination that she had in an interview with an agent of the defendant signed a sworn statment in which among other things she had said "the car was about fifteen yards away when I first saw her;" "she seemed to be stooping over as car approached her and she paid no attention to the warning;" "I feel sure car wouldn't have hit her if she hadn't moved back, but I couldn't say whether she took a step backwards or not, as it was quite dark where this took place;" "she had stood about two feet from the right rail alongside of auto and there were one or two other people with her." She admitted making the last three quoted statements and said they were true, but didn't remember making the first.

The young lady sitting at the left end of the front seat testified that from the "top of the hill" she "saw the lady and . . . a fellow stooping down" also the red light on an automobile. There was no one in the automobile. The woman did not move as the car approached her. Learned afterwards that her name was Morrison. When half way down the hill thought the woman was going to be struck. Witness said she was not a good judge of distances, and didn't know how far it was from top of hill to place of accident. This witness some eight months after the accident had signed a statement. Witness denied saying she "first saw the woman at right of track when car was over one length away," as was recorded in the statement.

The third one of the young ladies who sat on the front seat was called by the defendant. She said the accident happened "right near the house with the hedge around it;" she saw an automobile right at the curbstone and a stooping figure; when she first saw the stooping figure, the car was about opposite a slate-colored house, which she thinks is next south of the house with the hedge; she saw the figure move and it seemed to move back towards the track. She was shown a signed statement which contained this sentence, "This lady was about fifty feet away when I first saw her." The witness said positively that she didn't say that; that

the defendant's agent asked her if it was fifty feet, to which she had replied, "I couldn't say how much fifty feet was." The agent of the defendant who obtained these statements testified in effect that he didn't remember anything these witnesses had told him but that he had written only what they related to him.

From the top of the hill to the middle of the bare spot is shown to be upwards of 400 feet—the exact location of the top not being stated with exactness in the testimony. If the slate-colored house be the one next south of the house with the hedge, then the distance from the entrance to the south apartment thereof to the middle of the bare spot is given as 131 feet. Some of the witnesses say that the electric car made a quick stop. The motorman says it stopped in two-thirds of its length or 28 feet; the conductor says that when it stopped the rear of the car was a little to the south of the first large tree. Several witnesses say that after the car stopped the plaintiff was to the rear of the car a car length or one and a half car lengths.

(1) There was therefore conflicting testimony as to the precise place of the accident, as to the speed of the car, as to whether the plaintiff moved towards the track just before the accident and as to the distance from which she could be seen by those on the car as it approached her. We think there was testimony from which, if believed, the jury could properly conclude that the plaintiff did not move from the position she had taken, that she was seen by those on the front seat of the electric car at such a distance as to permit the motorman to see that she was in a place of danger and apparently unaware of it, and that he was negligent in not stopping the car in order to avoid hitting her, in accordance with the doctrine of the last clear chance as stated in *Underwood* v. *O. Colony Street Ry. Co.*, 33 R. I. 319, 325. Accordingly it was not error to submit the case to the jury. The exception to the denial of the motion to direct a verdict is therefore overruled.

The eleventh request of the defendant, on the denial of which the ninth exception is based, may be considered out of its order in this connection.    It is as follows:  "11.  That (2) if as soon as the motorman saw the plaintiff in a position of danger, he used every appliance at his command to stop the car, he was not guilty of negligence in failing to stop the car before he struck the plaintiff."    The court below refused to so instruct "because that leaves out the point that he should have seen her, if he could have seen her."    We think there was no error in this ruling and the ninth exception is overruled.

Exceptions 6, 7, 8 and 10 are considered together in defendant's brief and instead of discussing them separately we will consider the one question to which they all relate, which is made clear by the charge and the exception thereto. The portion of the charge excepted to is as follows:  "Now I cannot say to you, as a matter of law at this time, whether or not she was guilty of negligence in not looking toward the Park—that is a question of fact for you to decide, whether in view of all the conditions existing there, all of the dangers which a reasonably prudent person might apprehend, whether she should have taken a look occasionally in the other direction.    It is a question of fact for you to say in the particular situation which existed there that night whether she should have looked occasionally at least in the direction of the Park.    Now she says that she knew that the cars used the right hand tracks and having that in mind she was looking in the direction from which she might expect danger to arise.    It certainly has appeared in the testimony and perhaps we all know, that the customary way for cars to run is on the right hand track unless some exigency exists. It also appears that although that is the customary practice all over the city where there are two tracks, that it isn't a uniform practice.    Any man who has observed at all the method of transportation knows perfectly well, as the evidence shows here, that where there is an occasion to tear up a street or repair tracks, or anything of that sort, some-

times only one track is used or the cars are run in a different way from what they are ordinarily run. Now it is a fair question of fact for the jury, having in mind the fact that the custom was to use that outbound track on the right hand side of the street for cars outbound, having in mind the fact that properly cars could use that track going in the other direction if they saw fit or if necessity required, whether or not she should have taken a look in the other direction and if she failed to do that, as a consequence of her failure to look up toward the track, she received this injury, whether that would be contributory negligence. If you say, however, that ordinary care did not require her to do that in the particular situation which existed there, if you say that that would amount to extraordinary care and not ordinary care, then she is not bound to take extraordinary care. If ordinary care is consistent with simply looking down at the place where the car ordinarily would run and watching out for that, then she would have complied with the standard I have indicated to you as requisite."

(3)    Defendant excepted on the ground that the jury should have been instructed that plaintiff was negligent as a matter of law in not again looking to the south.

As to the conflict of testimony relative to the question of whether the plaintiff suddenly moved towards the track or simply stood in the position originally taken by her, the court charged the jury in substance that if she stepped out suddenly, as one witness had stated, and in consequence was struck, the defendant would not be liable; so that the portion of the charge quoted clearly refers only to the question of her negligence as based on her own statement of where she stood, and particularly as to whether she was negligent in not from time to time looking along the track towards the south. Having seen no car approaching from the south as she alighted facing in that direction and immediately taking a position which permitted her to see a car coming from the north there must have been an appreciable period of time within which she was not negligent, even if the position occupied would be a place of danger when a car was passing.

The question is whether or not she was negligent in continuing to remain in the place in which she stood without looking again in the direction of the Park.  She says that according to her observation, where there were two tracks in a street cars always proceeded on the track which, in relation to the direction in which they were going, is on the right, and that she never knew them to go otherwise;  that she had not been on Elmwood avenue for seven or eight months and in substance that she was not aware of any existing condition or situation which affected or altered the mode of operating cars there.  If her statements in this regard be accepted as true, yet if she heard a car approaching and thereupon having observed that no car was to be seen coming from the city, if she then omitted to look in the other direction there would certainly be some basis for a claim of negligence on her part.  She says, however, that she did not see or hear the car.  Two other persons standing by her side also say that they did not see or hear it until it was right upon them.  The chief reason suggested for this failure to hear the car and any warning it gave by bell or whistle is the noise caused by numerous automobiles passing there and the blowing of their horns.  The court is of the opinion that the situation thus presented made it proper to submit to the jury for its determination as a question of fact whether the plaintiff was in the exercise of the care required of her in the circumstances in failing to see or hear the approaching car in season to move from the place where she stood, if need be, and that therefore the trial court did not err in so submitting it.   While some of the cases cited by the defendant are somewhat similar to the case at bar in showing a reliance upon the regular or customary movement of steam trains and street cars, in other respects they contain features making them distinguishable.

The plaintiff in *Beerman* v. *Union R. R. Co.*, 24 R. I. 275, lived near the scene of the accident and was thoroughly acquainted with the location and the running of the cars.  Apparently there was a single track on Camp street—the

place of the accident—on which cars were operated in both directions. The plaintiff came out of a cross street at right angles, looked to his right and proceeded to cross the track with a car coming from the other direction so near that an accident was inevitable. Obviously the failure to look in both directions was in the circumstances a lack of ordinary care. As to what constitutes ordinary care, the court on page 280, says, "What is ordinary care under one set of circumstances might amount to negligence under a different set of circumstances. Ordinary care is such care as a person of ordinary prudence exercises under the circumstances of the danger to be apprehended."

In *Baldwin* v. *Heraty*, 136 Mich. 15, which the defendant says is in its facts more nearly like those in the present case than any other case cited, the jury returned a verdict for the defendant in the lower court from which the plaintiff appealed. In that case a person riding a bicycle in a northerly direction in the middle of the easterly of two street car tracks on hearing a car approaching behind him, apparently assumed that the car was on the easterly track and without looking behind crossed over to the westerly track on which the approaching car really was and was almost immediately struck and killed. The court said that, "The evidence conclusively shows that the deceased, knowing that a car was coming, and hearing its warning, rode in front of it without looking behind, upon the assumption that it was upon the easterly track. This was contributory negligence, unless he had a right to rely upon the practice as an invariable one." As a matter of fact the practice was not an invariable one as some northbound cars ran regularly on the west track. Plaintiff's proof on this point rested upon the testimony of a witness who was with the deceased at the time of the accident, that so far as he had observed, it was customary for northbound cars to go on the east track. The court said, "But this was not proof of such uniformity of practice as to justify the decedent in taking it for granted that this car was upon the east track, and disregarding the duty of

turning his head to see whether he was safe when he heard the bell." In that case the decedent heard the approaching car and suddenly without looking placed himself in its path. His failure to look after being warned of its approach is recognized as significant evidence of his negligence. It is distinguishable from the present case in that the plaintiff, if her testimony is believed, did not hear the car and was not aware of its approach. In passing it may be noted that in *Baldwin* v. *Heraty* the court held that there was no evidence warranting the inference that the accident could have been prevented after discovery of decedent's negligence.

The other cases cited by defendant do not seem sufficiently in point to require separate consideration. They are cases in which persons attempted to cross without looking steam-railway tracks in front of approaching trains, which were close at hand and plainly in sight. The only suggested similarity is that in so doing they relied upon what they understood was the regular or customary movement of trains. We think, however, that the other circumstances of those cases readily distinguish them from the present case.

Exceptions 6, 7, 8 and 10 are therefore overruled.

(4) The court later in its charge explained the doctrine of the last clear chance and instructed the jury in effect that if it were assumed that the plaintiff was negligent in failing to look towards the Park and continued to be negligent until she was struck and that the motorman saw she was standing in dangerous proximity to the track, and apparently did not appreciate her danger or hear his warning signal, and he then had the opportunity to avoid striking her by using the appliances under his control for stopping the car and failed to do so, the company would be liable notwithstanding her negligence. No exception was taken to this portion of the charge. Therefore, under this statement of the law even if the jury were of the opinion that she was negligent in not looking towards the Park and in standing where she did, that would not be decisive of the case in the event that they also found that the motorman was guilty of negligence

under the doctrine of the "last clear chance." In such case the final act of negligence of the motorman would be the proximate cause of the injury to the plaintiff. The question of whether he was thus negligent clearly appears to be the vital one in this case.

A careful examination of the testimony satisfies us that it would be difficult to uphold the verdict except on the testimony to which the doctrine of the last clear chance is applicable. In all probability the car was going at a rate of speed greater than that permitted by ordinance. There is little, if any, evidence however to show that this was negligence in the existing circumstances.

So far as the exception taken to the denial of the motion for a new trial relates to the question of liability, inasmuch as there was conflicting evidence justifying the submission of the case to the jury and the trial judge has approved of the verdict, we do not find that he was clearly in error and the exception in this respect is overruled.

(5) It remains to consider this exception as based on the claim that the damages awarded are excessive. By the blow she received when struck by the car the plaintiff received a comminuted fracture of the humerus of the left arm. She was immediately taken to the Rhode Island Hospital. After the lapse of about a week, to use the language of the surgeon in charge "it was deemed necessary to make of this . . . a compound fracture; that is, . . . to cut in upon the fracture itself from the outside." This was done and after a few days the cut or wound became infected, pus formed, followed by necrosis of the splintered bone, necessitating three operations at later periods for the removal of fragments of diseased bone, as well as another for an abscess in the left arm-pit which had resulted from the infection. She remained in the hospital from June 20 to November 13. She returned to it in January, 1916, for one of the operations and remained about two weeks; was there in February for about the same time for a second operation and in April for nother. In the first operation the broken bones were wired

into position; later drainage tubes of considerable length were inserted in the wound and maintained there for a long period, causing severe pain by their insertion and removal, and from May, 1916, to the end of the following September the arm was subjected to more than forty bakings at a high temperature. The plaintiff early complained of pain in the right thigh and in the right leg above the knee, and after leaving the hospital and at the time of trial of a painful condition of the coccyx, but there were no objective symptoms of injury to either. At the time of the trial the wound on the arm had healed, leaving a depressed or grooved scar on the outside of the arm about seven inches in length. The freedom of movement of the arm, particularly at the elbow, was impaired to a considerable extent and the medical testimony was practically unanimous in saying that there would be some permanent diminution in the movement and usefulness of the arm, although differing somewhat as to its extent. It was also said that she would probably on occasions suffer pain in it due to changes in the weather. At the trial she testified that she slept well, had a good appetite and had regained her normal weight of about 155 pounds. She had walked to Market Square from Olneyville on seven or eight occasions since the accident, but it made her tired and she rode back. She had done no work since she was hurt. When injured she was twenty-six years old, was in good health, was then working and for about a year before had worked in the Paragon Worsted Mills as a burler, earning on an average ten and one-half dollars a week. She had worked in mills previously but her earnings in them were not given. By the life tables her expectancy of life was about thirty-seven years. There was no evidence that she had incurred any expense for surgical or medical services. The court in its charge to the jury as to the matter of damages in pointing out the different things for which the plaintiff was entitled to compensation, in case the defendant was held to be liable, said "So far as it appears, the principal injury to this plaintiff is in the left arm, also shoulder joint

and things connected therewith." In his rescript the trial judge says that when the jury announced its verdict he "was inclined to believe that the damages were excessive" but that "after a re-examination of the testimony and upon careful deliberation" he had concluded that "although the amount awarded is larger than" he would have given, he is unable to "say that the excess is so large" as to warrant "setting the verdict aside as excessive." He also says "it seems to me reasonable to suppose that a considerable part of this award was given by the jury as compensation for the pain and suffering endured by the plaintiff." We think it must have been the chief element of the award.

As to the action of the trial judge in denying the motion for a new trial on the ground that the damages awarded were excessive, the court is of the opinion that said damages are so excessive that justice requires that there should be a new trial on that question unless they are reduced. In the trial no evidence was offered showing that the plaintiff had been subjected to any expense for medical attendance or other service rendered in her recovery from her injuries, so that the two principal elements of damage were the loss of wages, actual and prospective, and compensation for pain and suffering, past and future. Plaintiff's counsel in his brief computes her actual loss in wages from the date of the accident to the date of trial at $10.50 a week, which she was earning prior to the accident, to be $724.50. Then estimating that for the future she would be able "on the average to earn half as much as she has in the past at some kind of employment," he computes that her prospective loss on an expectation of life for thirty-seven and one-half years would be $10,237.50, the two items of pecuniary loss as thus computed together amounting to $10,962. It is not too much to presume that this claim of the pecuniary loss of the plaintiff was urged upon the jury. If the jury accepted this claim of loss as a fair one, then in their total award of damages an allowance of not much in excess of $5,000 was made as compensation for pain and suffering. This, of course,

cannot be asserted as a fact. But if we accept the suggestion of her counsel that for the future the plaintiff will be able on the average to earn half as much as she did before the accident, a suggestion which in the light of the evidence seems reasonable, then his computation of the prospective loss is erroneous, in that there is no attempt to estimate the present pecuniary value of such loss to be paid now in one sum instead of in weekly payments spread over a period of thirty-seven years, which is the average of the two tables of expectancy of life in evidence. Wages at $10.50 a week yield a total of $546 for one year, one-half of which is $273. The present value of an annuity of $273, for thirty-seven years at 4% as shown by approved tables is $5,225.93. If to that the actual loss of wages shown, $724.50, be added, the total pecuniary loss, actual and prospective, is $5,950.43. Computing the present value at 4% is not unfavorable to the plaintiff inasmuch as an increase in the rate of interest results in a smaller present value of the annuity. Assuming as before that the jury allowed the plaintiff's claim of pecuniary loss of one-half earning power for the future, then the verdict would represent an allowance of about $10,000 for pain and suffering.

We are of the opinion, therefore, upon a consideration of the evidence that the damages are excessive and that there was error in the denial of the motion for a new trial on the question of damages. In so far as the exception taken to the denial of the motion for a new trial relates to the question of damages it is sustained; as to all the other exceptions they are overruled.

The cause is remitted to the Superior Court with directions to grant a new trial on the question of damages only unless within ten days after the return of the papers in said cause to said court the plaintiff shall file her remittitur in writing of so much of its verdict as is in excess of $11,000; and if such remittitur be filed, to enter judgment for the plaintiff on the verdict as thus reduced by the remittitur.

*A. B. Crafts, Augustine H. Downing,* for plaintiff.
*Clifford Whipple, G. Frederick Frost,* for defendant.